## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

C P                                    CASE NO.  2:24-CV-01615

VERSUS                                 JUDGE JAMES D. CAIN, JR.

DEFENDANT 1                            MAGISTRATE JUDGE LEBLANC

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)

EXHIBIT
A

## **TABLE OF CONTENTS**

I.    BACKGROUND .................................................................................................1

    A.  THE LOUISIANA LEGISLATURES' ENACTMENT OF THE REVIVAL PROVISIONS AND THE INITIAL ATTACKS ON CONSTITUTIONALITY ................................................................................1

    B.  C.P.'S RELEVANT PROCEDURAL BACKGROUND ................................4

    C.  THE "NEW" ARGUMENTS ARE IDENTICAL TO THOSE ALREADY RASIED, AND DISTRICT COURTS AROUND THE STATE ARE OVERRULING SIMILAR EXCEPTIONS OF PRESCRIPTION...................4

II.   LEGAL STANDARD.........................................................................................6

    A.  THE 12(B)(6) STANDARD ........................................................................6

    B.  BURDEN OF PROOF – CONSTITUTIONALITY CLAIMS……………7

III.  LAW AND ARGUMENT………………………………………………………8

    A.  THE UNITED STATES TAKINGS CLAUSE………………………………..……………………9

        a.  No Similar Revival Provision Has Ever Been Struck Down Under Any State or Federal Takings Clause………………………….......9

        b.  The Right to a Time-Bar Defense Against a Tort Claim is Not a Recognized Species of Property for Purposes of Federal Takings Clause………………………………………………………..11

            i.   Defendant Fails to Engage with the Threshold Question of Whether the Right at Issue Triggers Takings Clause Protection…………………………………………………11 R

            ii.  The Takings Clause Primarily Applies to Land and Physical Things or Incorporeal Rights Directly Tied Thereto………………………………………………..……..12

            iii. Courts are Very Reluctant to Expand Takings Clause Protection Beyond its Traditional Scope…………………12

            iv.  The Right Assert a Time-Bar Does Not Have the Traditional Indicia of Property Rights That Fall Within Takings Clause Protection…………………………………13

            v.   Expanding the Takings Clause Definition of "Property" to Include Rights to Assert a Remedy Would Freeze the Courts in Time……………………………………………15

        c.  The Public Purpose Requirement is Met Wherever, As Here, The Police Power Was Used to Enact a Law…………………………...16

        d.  Defendant's Skillful Excision of Key Words and Concepts from *Apfel* Paints a Misleading Picture…………………………………17

        e.  The Revival Provision Does Not Amount to a Regulatory Taking Because it Does Not Go Too Far………………………………...20

   i. Only Regulations which "Go Too Far" Amount to a Taking in the Constitutional Sense…………………………………20

   ii. Penn Central Factor 1: The "Economic Impact" of the Regulation on the Claimant Involves More Than Simply the Dollar Amount……………………………………….21

   iii. Penn Central Factor 2: There is no Evidence that the Regulation Interferes with Defendant's Reasonable Investment Backed Expectations…………………………25

   iv. Penn Central Factor 3: The Character of the Governmental Action Weighs in Favor of Constitutionality…………………………………………26

 B. THE LOUISIANA TAKINGS CLAUSE…………………………………29

  a. The Louisiana Takings Clause Has Never Required "Just Compensation" to be Paid for Destruction of Property Caused by Reasonable Restrictions Enacted Through the State's Police Power for the Public Welfare…………………………………………………..29

  b. Louisiana Takings Clause Prong 1: The Right to a Remedy is not the Type of Property that Triggers Louisiana Takings Clause Protection Because the Clause was Designed to Protect Land and Other Tangible Property……………………………………………………….30

  c. Louisiana Takings Clause *Chambers* Prong 2: The Revival Provision is not a "Taking" in the *Constitutional Sense* and Therefore No Compensation is Owed……………………………………………34

  d. Louisiana Takings Clause *Chambers* Prong 3: *Bienvenu II* Already Established that the Revival Provision was Enacted for a Public Purpose……………………………………………………….36

 C. FEDERAL BILL OF ATTAINDER………………………………………37

  a. Defendant's Federal Bill of Attainder Argument has Already Been Rejected………………………………………………………37

IV. FEDERAL *EX POST FACTO* CLAUSE…………………………………………39

V. THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS. ALTERNATIVELY, TO THE EXTENT THERE IS ANY DOUBT AS TO THE ISSUES ARISING UNDER THE LOUISIANA CONSTITUTION, IT SHOULD CERTIFY THOSE QUESTIONS TO THE LOUISIANA SUPREME COURT………………………………………………………………...40

VI. CONCLUSION……………………………………………………..41

## **TABLE OF AUTHORITIES**

**Cases**

*Andrus v. Allard,*
  444 U.S. 51 (1979) .................................................................................................. 22

*Armstrong v. U.S.,*
  364 U.S. 40 (1960) .................................................................................................. 22

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................................. 7

*Aurora Pub. Sch. v. A.S.,*
  2023 CO 39, 531 P.3d 1036 (2023) ....................................................................... 10

*Avenal v. State,*
  2003-3521 (La. 10/19/04), 886 So. 2d 1085 ......................................................... 30

*Barras v. O'Rourke,*
  2019-412 (La. App. 3 Cir. 12/18/19), 287 So. 3d 817 ........................................... 15

*Bazley v. Tortorich,*
  397 So.2d 475 (La. 1981) ....................................................................................... 36

*Bd. of Barber Examiners of La. v. Parker,*
  190 La. 214 (1938) ............................................................................................ 37, 41

*Bd. of Dirs. of the La. Recovery Dist. v. All Taxpayers, Property Owners, & Citizens of La.,*
  529 So.2d 384 (La. 1988) ................................................................................... 8, 41

*Bell Atlantic Corp. v. Twombley,*
  550 U.S. 544 (1955) .................................................................................................. 7

*Berman v. Parker,*
  348 U.S. 26 (1954) .................................................................................................. 17

*Bienvenu v. Defendant 1,*
  2023-01194 (La. 3/22/24), 382 So. 3d 38 ............................................................... 2

*Bienvenu v. Defendant 1,*
  2023-01194 (La. 5/10/2024), 2024 WL 359089 (Appellate Brief) ........................... 3

*Bienvenu v. Defendant 1,*
  2023-01194 (La. 5/10/2024), 384 So. 3d 885 .......................................................... 3

*Bienvenu v. Defendant 1 ("Bienvenu II"),*
  2023-01194 (La. 6/12/24), 386 So. 3d 280 .................................................... passim

*Bowen v. Gilliard,*
  483 U.S. 587 (1987) ................................................................................................ 14

*Bustos v. Martini Club Inc.,*
  599 F. 3d 458 (5th Cir. 2010) ................................................................................... 7

*Calder v. Bull,*
  3 U.S. 386 (1798). ........................................................................... 39

*Campbell v. Holt,*
  115 U.S. 620 (1885) ................................................................... 9, 14

*Chase Sec. Corp. v. Donaldson,*
  325 U.S. 304 (1945) ................................................................... 9, 14

*City Bar, Inc. v. Edwards,*
  2021-1437 (La. App. 1 Cir. 8/30/22), 349 So. 3d 22........................ 30, 33

*City of New Orleans v. Charouleau,*
  121 La. 890 (1908) ........................................................................ 29

*City of New Orleans v. Murat,*
  119 La. 1093 (La. 1907) ................................................................ 29

*City of New Orleans v. New Orleans Pub. Serv.,*
  168 La. 984 (1929) ........................................................................ 29

*City of New Orleans, v. La. Assessors' Ret. & Relief Fund,*
  2005-2548 (La. 10/1/07), 986 So.2d 1 ........................................... 8, 40

*City of Shreveport v. Kansas City, S. & G. Ry. Co.,*
  167 La. 771 (1929) ........................................................... 29, 34, 35

*Colle v. Brazos County, Tex.,*
  981 F. 2d 237 (5th Cir. 1993) .......................................................... 6

*Columbia Gulf Transmission Co. v. Hoyt,*
  252 La. 921 (1968) ........................................................................ 32

*Concrete Pipe & Prods. v. Const. Laborers Pen.,*
  508 U.S. 602 (1993) ............................................... 10, 21, 22, 26

*Connolly v. Pension Benefit Guar. Corp.,*
  475 U.S. 211 (1986) ................................................. 10, 22, 26

*Corn v. City of Lauderdale Lakes,*
  95 F.3d 1066 (11th Cir. 1996) ........................................................ 11

*Cosgriffe v. Cosgriffe,*
  262 Mont. 175 (1993) ..................................................................... 9

*Culotta v. Police Jury of Ascension Pa.,*
  316 So. 2d (La. Ct. App. 1975) ................................................ 32, 33

*DeLonga v. Diocese of Sioux Falls,*
  329 F.Supp. 2d. 1092 (S.D. S.D. 2004) ........................................... 9

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) .................................................... 13, 16

*Deutsch v. Masonic Homes of Cal., Inc.,*
  164 Cal.App.4th 748, 80 Cal.Rptr.3d 368 (Cal. Ct. App.2008) .............. 9

iv

*Doe v. English, et al.*,
   24-13245 (22nd J.D.C., Jan. 16, 2025) ................................................................ 5

*Doe v. Hartford Roman Cath. Diocesan Corp.*,
   317 Conn. 357 (2015) ....................................................................................... 9

*Doe v. Jesuit High School of New Orleans, et al.*,
   2020-05419 (Civ. Dist. Ct. for the Parish of Orleans, Jan. 27, 2025) ...................... 5

*Eastern Enterprises v. Apfel*,
   524 U.S. 498 (1998) ................................................................................. passim

*Faulk v. Union Pac. R.R. Co.*,
   2014-1598 (La. 6/30/15), 172 So. 3d 1034 ................................................ 30, 31, 34

*Flemming v. Nestor*,
   363 U.S. 603 (1960) ..................................................................................... 38, 39

*Foretich v. U.S.*,
   351 F.3d 1198 (D.C. Cir. 2003) ................................................................... 38, 39

*Franklin v. Regions Bank*,
   Nos. 16-1152, 17-1047, 2019 WL 3491698 (W.D. La. 2019) ................................ 7

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ........................................................................................ 14

*Goldblatt v. Hempstead*,
   369 U.S. 590 (1962) ........................................................................................ 27

*Greater New Orleans Expressway Comm'n v. Olivier*,
   2004-2147 (La. 1/19/05), 892 So.2d 570 ............................................................ 7

*Hadacheck v. Sebastian*,
   239 U.S. 394 (1915) ................................................................................... 21, 27

*Harvey v. Merchan*,
   311 Ga. 811 (2021) ........................................................................................... 9

*Hi. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984) ........................................................................................ 16

*In re Am. Waste & Pollution Control Co.*,
   588 So.2d 367 (La. 1991) ................................................................................... 8

*In re Matter of World Trade Ct. Lower Manhattan Disaster Site Lit.*,
   30 N.Y.3d 377 (Ct. App. N.Y. 2017) ............................................................... 10

*In re S.D.*,
   52, 238 (La. App. 2 Cir. 5/23/18), 250 So. 3d 1097 ............................................. 8

*K.E. v. Hoffman*,
   452 N.W. 2d 509 (Minn. 1990) .......................................................................... 9

*Kopalchick v. Cath. Diocese of Richmond*,
   274 Va. 332, 645 S.E2d 439 (2007) ................................................................... 9

*La. Crawfish Producers Ass'n—West v. Amerada Hess Corp.*,
  919 F. Supp. 2d 756 (W.D. La. 2013) ............................................................. 6, 7

*La. Seafood Mgmt. Council v. La. Wildlife & Fisheries Comm'n*,
  97-1367 (La. 5/19/98), 715 So. 2d 387 ................................................................ 36

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ............................................................................................. 25

*Long v. Ne. Soil Conservation Dist. of La.*,
  226 La. 824 (1954) ............................................................................................... 10

*Lousteau v. Congregation of Holy Cross Southern Province, Inc.*,
  No. 21-1456, 2022 WL 2065539 (E.D. La. 2022) ....................................... 2, 37, 38

*Lowenburg v. Sewerage & Water Bd. of New Orleans*,
  2019-0524 (La. App. 4 Cir. 7/29/20), 387 So. 3d 548 ....................................... 32

*Miller v. Schoene*,
  276 U.S. 272 (1928) ............................................................................................. 27

*Morgan's La. & T.R. & S.S. Co. v. R.R. Comm'n of La.*,
  138 La. 377 (1915) ............................................................................................... 15

*Mugler v. Kansas*,
  123 U.S. 623 (1887) ....................................................................................... 14, 27

*Pa. Coal Co. v. Mahon*,
  260 U.S. 393 (1922) ....................................................................................... 20, 36

*Palazzolo v. R. I.*,
  533 U.S. 604 (2001) ....................................................................................... 21, 25

*Penn Central Transp. Co. v. New York City*,
  438 U.S. 104 (1978) ........................................................................... 20, 25, 26, 27

*Pharm. Rsch. & Mfrs. of Am. v. Murrill*,
  No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) ..................... 12

*Phillips v. Washington Legal Found.*,
  524 U.S. 156 (1998) ............................................................................................. 12

*Picone v. Lyons*,
  601 So. 2d 1375 (La. 1992) ............................................................................ 14, 15

*Pittman v. Chicago Bd. of Educ.*,
  64 F.3d 1098 (7th Cir. 1995) ......................................................................... 11, 14

*Polk v. Edwards*,
  626 So.2d 1128 (La. 1993). ............................................................................... 7, 8

*Pro–Eco, Inc. v. Board of Comm'rs of Jay County, Ind.*,
  57 F.3d 505 (7th Cir.) .......................................................................................... 11

*Roe v. Doe*,
  59 Haw. 259, 581 P.2d 310 (1978) ..................................................................... 10

*Roe v. Ram,*
   No. CIV. 14-00027 LEK-RL, 2014 WL 4276647 (D. Haw. Aug. 29, 2014)............................ 9

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) .................................................................................................. 12, 13

*Sam Doe v. Soc'y. of Roman Cath. Church of Diocese of Lafayette,*
   2022-00829 (La. 10/4/22), 347 So.3d 148.................................................................. 2

*Schwing Lumber & Shingle Co. v. Peterman,*
   140 La. 71 (1916) ...................................................................................................... 15

*Scott v. Greenville County,*
   716 F.2d 1409 (4th Cir.1983) ..................................................................................... 11

*Scott v. Ruston La. Hosp. Co., LLC,*
   No. 16-0376, 2017 WL 979104 (W.D. La. Mar. 2017)............................................. 6

*Sheehan v. Oblates of St. Francis de Sales,*
   15 A. 3d 1247 (Del. 2011) ......................................................................................... 9

*Shirley v. Reif,*
   260 Kan. 514, 920 P.2d 405 (1996)........................................................................... 9

*Sliney v. Previte,*
   473 Mass. 283, 41 N.E. 3d 732 (2015) ..................................................................... 9

*Smith v. Avant Garde Homeowners Ass'n, Inc.,*
   06-427 (La. App. 5 Cir. 10/31/06), 945 So. 2d 89.................................................... 15

*State Bond Comm'n of the State of La. v. All Taxpayers, Property Owners & Citizens,*
   525 So. 2d 521 (La. 1988) ......................................................................................... 8

*State ex rel. La. Dep't of Educ.-Food Serv. v. Bright Beginnings Child Care, Inc.,*
   42, 145 (La. App. 2 Cir. 5/16/07), 957 So. 2d 362 ................................................... 15

*State through Dep't of Transp. & Dev. v. Chambers Inv., Inc.,*
   595 So.2d 598 (La. 1992) ..................................................................................... passim

*State v. All Prop. & Cas. Ins. Carriers Authorized & Licensed to Do Bus. in State,*
   2006-2030 (La. 8/25/06), 937 So.2d 313................................................................... 15

*State v. Lee,*
   31,859 (La. App. 2 Cir. 2/24/99), 728 So. 2d 1042 .................................................. 7

*State v. Payssan,*
   47 La. Ann. 1029 (1895) ............................................................................................ 29

*State v. Schnyder,*
   06-29 (La. App. 5 Cir. 6/28/06), 937 So. 2d 396....................................................... 15

*State v. Weaver,*
   2001-0467 (La. 1/15/02), 805 So.2d 166................................................................... 7

*State v. Williams,*
   06-443 (La. App. 5 Cir. 10/31/06), 945 So. 2d 106................................................... 15

*T.M. v. Diocese of Alexandria,*
No. 93396-1, slip op., (10th J.D.C. 8/29/2023) ............................................... 2

*U.S. v. 0.073 acres of land, more or less, situated in Pars. of Orleans & Jefferson, La.,*
705 F.3d 540 (5th Cir. 2013) ............................................................................. 13

*U.S. v. Gen. Motors Corp.,*
323 U.S. 373 (1945) .......................................................................................... 12

*Vill. of Euclid, Oh. v. Ambler Realty Co.,*
272 U.S. 365 (1926) .......................................................................................... 21

*W.B. v. The Roman Catholic Church of the Diocese of Houma-Thibodaux,*
No. 200161 (32nd J.D.C., Jan. 13, 2025) ........................................................... 5

*Webb's Fabulous Pharmacies, Inc., v. Beckwith,*
449 U.S. 155 (1980) .......................................................................................... 12

## Statutes

LA. REV. STAT. § 9:2800.9 ...................................................................................... 23

LA. REV. STAT. § 9:406 ........................................................................................... 15

LA. SUP. CT. Rule XII ............................................................................................ 41

## Other Authorities

http://www.lcdiocese.org/images/pdfs/2024-04-24_List-of-Clergy-Credibly-Accused.pdf .......... 1

https://childusa.org/2022sol/ .................................................................................... 9

https://files.ecatholic.com/2136/documents/2023/9/List.Disclosure%20of%20Diocese%20of%20
Lafayette%20Priests%20and%20Deacons%20Credibly%20Accused%20of%20Sexual%20Ab
use%20of%20a%20Minor%20or%20Vulnerable%20Adult%20revised%2007.08.22.pdf?t=169
5845566000 ...................................................................................................... 2

https://files.ecatholic.com/26904/documents/2024/7/List%20Update%206.30.2024.pdf?t=17199
43326000 ......................................................................................................... 2

https://htdiocese.org/disclosure-of-names ..................................................................... 2

https://nolacatholic.org/2018-report ............................................................................ 2

https://www.diocesealex.org/diocese-releases-names-of-clergy/ ......................................... 2

KADN Staff, *Louisiana AG files rehearing application after Louisiana Supreme Court overturns
sex abuse 'lookback' window law*, https://www.kadn.com/news/local/louisiana-ag-files-
rehearing-application-after-louisiana-supreme-court-overturns-sex-abuse-lookback-window-
law/article_62f70aec-f38e-11ee-9b9d-2391917534f5.html ....................................... 3

Laurence H. Tribe, *American Constitutional Law* 596–97 (2d ed.1988) ................... 36

Oliver Field, *Ex Post Facto in the Constitution*, 20 MICH. L. REV. 315, 321 (1922) ................ 39

RAINN, *Children and Teems: Statistics*, https://www.rainn.org/statistics/children-and-teens.... 24

Rep. Jason Hughes, May 3, 2021, Hearing at the House of Representatives, Bill 492, at 5:11-7:4
............................................................................................................................ 24

Rogers N.T., Power C., Pinto Pereira S.M. *Child maltreatment, early life socioeconomic disadvantage and all-cause mortality in mid-adulthood: findings from a prospective British birth cohort*. BMJ Open 2021; https://pubmed.ncbi.nlm.nih.gov/34551950/ .......................... 23

**Regulations**

1993 La. Sess. Law Serv. Act 32 (H.B. 897)................................................................... 15

1997 La. Sess. Law Serv. Act 1110 (S.B. 1128) ............................................................. 15

2005 La. Sess. Law Serv. 1st Ex. Sess. Act 6 (H.B. 90).................................................. 15

2021 La. Acts 322 §2 .......................................................................................................... 1

2022 La. Acts 386 § 2 .......................................................................................................... 1

La. Senate Concurrent Resolution No. 26 of the 2024 Regular Season ........................ 3

**Constitutional Provisions**

1921 La. Const. Ann. art. I, § 2 ...................................................................................... 29

1921 La. Const. Ann. art. IV, § 15 .................................................................................. 29

La. Const. Ann. art. I, § 4(A)................................................................................... 29, 34

**MAY IT PLEASE THE COURT:**

Plaintiff, C.P., respectfully submits this Memorandum in Opposition to the Motion to Dismiss [R. Doc. 9] filed by Defendant, the Society of the Roman Catholic Church of the Diocese of Lake Charles (hereinafter "Defendant").

## I.    BACKGROUND

### A. THE LOUISIANA LEGISLATURE'S ENACTMENT OF THE REVIVAL PROVISIONS AND THE INITIAL ATTACKS ON CONSTITUTIONALITY

In 2021, the Louisiana Legislature passed a widely celebrated Act which finally gave childhood sexual abuse survivors (the "Survivors") whose civil claims had expired while they were still minors a chance at justice. 2021 La. Acts 322 §2; 2022 La. Acts 386 § 2. While the law was unanimously passed by the Louisiana Legislature, its constitutionality was immediately attacked by various Catholic defendants that have a long and disturbing history of hiring pedophiles (hereinafter, the various Catholic defendants will be collectively referred to as the "Catholic Organizations"). These Catholic Organizations began attacking the constitutionality of a provision contained in 2021 La. Acts 322 and 386 (the "Revival Provision") which revived all previously time-barred civil claims related to childhood sexual abuse for a limited window of time (the "Revival Window"). The constitutionality attacks began because these Catholic Organizations, which have multiple claims against them, stood to lose countless millions if the Revival Provision was upheld by the Louisiana Supreme Court. Money is not the only thing at stake if the Revival Provision was upheld; collectively, the Catholic Organizations within Louisiana have employed at least 225 likely child molesters.[1] Reviving the deadline to file civil lawsuits would inevitably lead to revealing many additional disturbing acts from their employees.

---

[1] The different Catholic Organizations have published documents to report each accused employee. Diocese of Lake Charles: http://www.lcdiocese.org/images/pdfs/2024-04-24_List-of-Clergy-Credibly-Accused.pdf; Archdiocese of

As soon as the Revival Provision was enacted, various Catholic Organizations began attacking the Revival Provision on a wide variety of theories, including multiple statutory and constitutional grounds. Over the course of the three-year legal war, each theory had fallen by the wayside[2] except for one – the Louisiana Due Process clause challenge.

The Louisiana Supreme Court first issued an opinion regarding the constitutionality of the Revival Provision in *Bienvenu v. Defendant 1*, 2023-01194 (La. 3/22/24), 382 So. 3d 38, reh'g granted, 2023-01194 (La. 5/10/24), 384 So. 3d 885, and opinion vacated on reh'g, 2023-01194 (La. 6/12/24), 386 So. 3d 280 ("*Bienvenu I*").  By the time the Louisiana Supreme Court held oral arguments for *Bienvenu I,* the sole challenge remaining was whether Act 386 was constitutional under the Due Process Clause found in Article I, Section 2 of the Louisiana Constitution. *See id.* Three months before the original Revival Window was scheduled to close, the *Bienvenu I* ruling was issued. The Louisiana Supreme Court issued a split four-three ruling declaring that the Revival Provision violated the Due Process clause. *See generally id*. The Court reasoned that the right to assert a time-bar defense is a "vested property right" and determined that any infringement on a "vested property right" is *de facto* unconstitutional. *Id*. However, the Louisiana Supreme Court failed to apply either of the constitutional scrutiny tests that typically apply to Due Process challenges. *See generally*, *id*. The Survivors were devastated. The ruling gained national media

---

New Orleans: https://nolacatholic.org/2018-report; Archdiocese of Alexandria-Shreveport: https://www.diocesealex.org/diocese-releases-names-of-clergy/; Diocese of Baton Rouge: https://files.ecatholic.com/26904/documents/2024/7/List%20Update%206.30.2024.pdf?t=1719943326000; Diocese of Houma-Thibodaux: https://htdiocese.org/disclosure-of-names; Diocese of Lafayette: https://files.ecatholic.com/2136/documents/2023/9/List.Disclosure%20of%20Diocese%20of%20Lafayette%20Priests%20and%20Deacons%20Credibly%20Accused%20of%20Sexual%20Abuse%20of%20a%20Minor%20or%20Vulnerable%20Adult%20revised%2007.08.22.pdf?t=1695845566000.

[2] See e.g. *Sam Doe v. Soc'y. of Roman Cath. Church of Diocese of Lafayette*, 2022-00829 (La. 10/4/22), 347 So.3d 148; *Lousteau v. Congregation of Holy Cross Southern Province, Inc.*, No. 21-1456, 2022 WL 2065539 (E.D. La. 2022), vacated by *Lousteau v. Holy Cross College, Inc.*, 81 F. 4th 937 (5th Cir. 2023); *T.M. v. Diocese of Alexandria*, No. 93396-1, slip op., (10th J.D.C. 8/29/2023).

attention. For several months, it appeared that the Catholic Organizations had secured victory in their attacks on the constitutionality of the Revival Provision.

The Louisiana Legislature then unanimously passed a Resolution calling into question the absence of a traditional Due Process review of *Bienvenu I*'s analysis. *See* La. Senate Concurrent Resolution No. 26 of the 2024 Regular Season. The Attorney General of Louisiana also filed an application for rehearing of *Bienvenu I* and released a public statement declaring that the ruling in *Bienvenu I* had "raise[d] serious concerns about the separation of powers and the proper judicial role as a violation of the separation of powers doctrine."[3]

The plaintiffs in *Bienvenu I* also requested rehearing, which the Louisiana Supreme Court granted. *Bienvenu v. Defendant 1*, 2023-01194 (La. 5/10/24), 384 So. 3d 885. It was amidst the widespread expectations of a reversal of *Bienvenu I* that the arguments relating to the Takings Clause first surfaced in an Amicus Brief presented to the Court by a New Orleans Catholic school, which happens to be particularly infamous for a history of repeated childhood sexual abuse scandals. *See Bienvenu v. Defendant 1*, 2023-01194 (La. 5/10/2024), 2024 WL 359089 (Appellate Brief).

Just two days before the expiration of the original Revival Window, the Court issued its ruling on rehearing, declaring that the Revival Provision was a valid exercise of the state's police power and that "the defendants have failed to identify any provision in the constitution that categorically prohibits an exercise of police power where such would impair vested rights." *Bienvenu v. Defendant 1*, 2023-01194 (La. 6/12/24), 386 So. 3d 280, 290 ("*Bienvenu II*"). The Court acknowledged that "vested property rights" are not entitled to absolute protection. *Id*. The

---

[3] KADN Staff, *Louisiana AG files rehearing application after Louisiana Supreme Court overturns sex abuse 'lookback' window law*, https://www.kadn.com/news/local/louisiana-ag-files-rehearing-application-after-louisiana-supreme-court-overturns-sex-abuse-lookback-window-law/article_62f70aec-f38e-11ee-9b9d-2391917534f5.html.

arguments relating to the Takings Clause contained in the Amicus Brief appear to have been given no weight by the Louisiana Supreme Court, as the arguments were not even mentioned in the majority opinion, the two concurring opinions, or the two dissenting opinions. At the time, it was widely believed to be the end of the constitutional attacks; one step closer to the victims' justice.

### B.  C.P.'S RELEVANT PROCEDURAL BACKGROUND

Two days before the original Revival Window closed, and after the Supreme Court issued its ruling in *Bienvenu II*, C.P. filed the instant lawsuit in the Louisiana 14th Judicial District Court for the Parish of Calcasieu.  [R. Doc. 1-4]. On November 25, 2024, Defendant filed a Notice of Removal to this Court. [R. Doc. 1].  Thereafter, Defendant filed the Instant Motion to Dismiss, rewrapping the non-prevailing constitutional challenges argued by other Catholic Organizations in *Bienvenu I* and *II* under the guise of "new" arguments pursuant to other clauses of the U.S. and Louisiana Constitutions.

Specifically, Defendant now advances facial constitutional challenges under the state takings clause ("Louisiana Takings Clause"), the federal takings clause ("Federal Takings Clause"), the federal prohibition on bills of attainder ("Bill of Attainder Clause"), and *ex post facto* laws ("*Ex Post Facto* Clause") (together the "'New' Arguments"). [R. Doc. 9-1 at 2]. These "New" Arguments are not unique to this Defendant but, instead, are being argued by multiple Catholic Organizations throughout the state.

### C.  THE "NEW" ARGUMENTS ARE IDENTICAL TO THOSE ALREADY RAISED, AND DISTRICT COURTS AROUND THE STATE ARE OVERRULING SIMILAR EXCEPTIONS OF PRESCRIPTION.

The repacking of the same regurgitated challenges used by other Catholic Organizations is evident when comparing the underlying arguments raised in *Bienvenu I* and *II* and the challenges being presented in the Instant Motion. The original arguments raised by the Catholic Organizations

alleged that the Revival Provision violated the Due Process clause by taking a defendant's vested property right in an unfairly retroactive way. *See Bienvenu II*, 386 So. 3d 280. The "New" Arguments presented in the Instant Motion likewise argue that the Revival Provision violates the Louisiana and Federal Taking Clauses, the Bill of Attainder Clause, and the *Ex Post Facto* Clause by taking a defendant's vested property right in an unfairly retroactive way. [*See* R. Doc. 9-1]. Just as the original arguments presented by the Catholic Organizations, the ultimate determination of each of the "New" Arguments hinges on the unconstitutional taking of a protectable property right and/or an allegation of unfair retroactivity. If these "New" Arguments had any merit, they could have—and should have—been made by the Catholic Organizations in *Bienvenu I* and *II.*

The Catholic Organizations are now crafting "New" Arguments to thwart the legislative intent of the Revival Provision. Arguments that are nearly identical to those raised by Defendant in the instant Motion to Dismiss are being urged by various defendant entities around the state in exceptions of prescription and no cause of action, and, to date, every court that has rendered a decision in these cases has overruled the exceptions. *See*, *e.g.*, *Doe v. Jesuit High School of New Orleans, et al.*, 2020-05419 (Civ. Dist. Ct. for the Parish of Orleans, Jan. 27, 2025) (Judge Mason overruling the defendant's Third Amended Peremptory Exception of Prescription); *Doe v. English, et al.*, 24-13245 (22nd J.D.C., Jan. 16, 2025) (Judge Zeller overruling the defendants' Exceptions of Vagueness, No Cause of Action and Prescription); *W.B. v. The Roman Catholic Church of the Diocese of Houma-Thibodaux*, No. 200161 (32nd J.D.C., Jan. 13, 2025) (Judge Ellender overruling the defendant diocese's Peremptory Exception of Prescription). The unanimous rejection of these arguments by various judicial district courts is illustrative of how baseless the instant motion is, and Plaintiff is heartened by the fact that judges around the state are seeing

through this transparent attempt by the institutions who harbor and enable pedophiles to evade liability yet again.

The uncertainty surrounding the validity of the Revival Provision has served as a strong deterrent to Survivors who might otherwise have come forward. For a Survivor, coming forward after decades of hiding is a terrifying prospect. And only a small percentage were willing to turn their lives upside down to file a lawsuit when there was still no answer from the Louisiana Supreme Court on whether the Revival Provision would be upheld.

The constitutional attacks must be stopped. As the Catholic Organizations continue to deny justice to Survivors, there are fewer Survivors left to claim it. Even after the *Bienvenu II* ruling was issued, definitively holding that the legislation enacting the Revival Window was constitutional, the Catholic Organizations continue to deny compensation to the Survivors while they operate under a "millions for defense, not a penny for tribute" approach to these claims. This Court should deny this Defendant's Motion to Dismiss and allow C.P. to finally access the justice he deserves.

## II.      LEGAL STANDARD

### A.  THE 12(B)(6) STANDARD

When reviewing a motion to dismiss, this Court "should focus exclusively on what appears in the complaint and its proper attachments." *La. Crawfish Producers Ass'n—West v. Amerada Hess Corp.*, 919 F. Supp. 2d 756, 761 (W.D. La. 2013) (internal citations omitted). "In deciding a Rule 12(b)(6) motion to dismiss, a court generally 'may not go outside the pleadings.'" *Scott v. Ruston La. Hosp. Co., LLC*, No. 16-0376, 2017 WL 979104 at * 3 (W.D. La. Mar. 2017) (citing *Colle v. Brazos County, Tex.*, 981 F. 2d 237, 243 (5th Cir. 1993)). This Court should review the Motion "'*accepting all* well-pleaded *facts as true and viewing those facts in the light most*

*favorable to the plaintiff.*" *La. Crawfish Producers Ass'n—West,* 919 F. Supp 2d at 761 (quoting *Bustos v. Martini Club Inc.,* 599 F. 3d 458, 461 (5th Cir. 2010) (emphasis original)). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, which the Court should accept as true, 'to state a claim that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 550 (1955)).

## B.  BURDEN OF PROOF – CONSTITUTIONALITY CLAIMS

Defendant misconstrues the burden of proof regarding prescription when a constitutionality challenge is the basis of that claim. Defendant's prescription argument hinges on its claim that the Revival Provision is unconstitutional. However, for purposes of the burden of proof, this Court should look to the governing law at the time of filing. Here, the Revival Provision governs the claims against this Defendant and the Petition for Damages is timely on its face.

Ordinarily, the burden of proof is on the party pleading prescription. *Franklin v. Regions Bank,* Nos. 16-1152, 17-1047, 2019 WL 3491698 at * 4 (W.D. La. 2019). When a plaintiff establishes a *prima facie* showing of timeliness, the burden of proving prescription rests with the defendant. See *State v. Lee*, 31,859 (La. App. 2 Cir. 2/24/99), 728 So. 2d 1042, 1044. Statutes enacted by the legislature are "presumed constitutional, and any doubt is to be resolved in the statute's favor." *State v. Weaver*, 2001-0467 (La. 1/15/02), 805 So.2d 166, 170 (internal citations omitted).  The presumption is especially forceful in the case of statutes enacted to promote a public purpose. *Polk v. Edwards*, 626 So.2d 1128, 1132 (La. 1993). Legislators are "presumed to have weighed the relevant constitutional considerations in enacting legislation and the legislative acts are presumed constitutional." *Greater New Orleans Expressway Comm'n v. Olivier*, 2004-2147 (La. 1/19/05), 892 So.2d 570, 573.

The party challenging the statute bears the burden of proving clearly and convincingly "that it was the constitutional aim to deny the legislature the power to enact the statute." *In re S.D.*, 52, 238 (La. App. 2 Cir. 5/23/18), 250 So. 3d 1097, 1098. The challenger must establish that no circumstances exist under which the act would be valid. *City of New Orleans, v. La. Assessors' Ret. & Relief Fund*, 2005-2548 (La. 10/1/07), 986 So.2d 1, 2-3. The Louisiana Legislature has plenary power and may enact any legislation that is not prohibited by the Constitution. *Polk*, 626 So. 2d at 1132 (*citing State Bond Comm'n of the State of La. v. All Taxpayers, Property Owners & Citizens*, 525 So. 2d 521 (La. 1988)). In order to hold legislation invalid under the Constitution, it is necessary to rely on some particular constitutional provision that limits the legislature's power. *Id.* (*citing In re Am. Waste & Pollution Control Co.*, 588 So.2d 367 (La. 1991)).

"In an attack upon a legislative act as falling within an exception to the Legislature's otherwise plenary power, it is not enough to show that the constitutionality is fairly debatable, but, rather, it must be shown clearly and convincingly that it was the constitutional aim to deny the Legislature the power to enact the statute." *Bd. of Dirs. of the La. Recovery Dist. v. All Taxpayers, Property Owners, & Citizens of La.*, 529 So.2d 384, 388 (La. 1988) (internal citations omitted).

Here, because Plaintiff filed his lawsuit within the Revival Window and alleged that his claim was revived by the Revival Provision, and the Revival Provision is presumed to be Constitutional, he has established a *prima facie* showing of timeliness and the burden then shifts to Defendant.  In order to prevail, Defendant must prove to this Court clearly and convincingly that the Revival Provision is unconstitutional.

## III.    LAW AND ARGUMENT

Defendant's "New" Arguments cannot succeed. Although the Louisiana Supreme Court did not directly address the "New" Arguments in *Bienvenu II*, its opinion sets forth binding

precedent on the underlying questions of law and fact which are determinative to the success of the "New" Arguments. Specifically, after an exhaustive review of the legislative history of the Revival Provision, *Bienvenu II* rendered binding conclusions on the following: (1) the intent which motivated the legislature to pass the provision, (2) the purpose the provision was enacted to serve, and (3) the reasonableness of the method employed. In order to grant Defendant's Motion to Dismiss with respect to any of the "New" Arguments, this Honorable Court would have to issue a ruling on those topics that is in direct conflict with the highest court of the state of Louisiana.

## A.  THE UNITED STATES TAKINGS CLAUSE

### a.  No Similar Revival Provision Has Ever Been Struck Down Under Any State or Federal Takings Clause.

Legislatures have been reviving time-barred claims for over 100 years, and the United States Supreme Court has been upholding said revivals as constitutional for just as long.[4] Laws reviving childhood sexual abuse claims are particularly common. At least 34 jurisdictions have enacted laws which use various methods to revive previously expired childhood sexual abuse claims.[5]  None of these laws have been struck down under the federal or any state Takings Clause. While Revival Provisions in some of the other states did face constitutional challenges, those challenges relied almost exclusively on either Due Process grounds or state laws that explicitly

---

[4] See *Campbell v. Holt*, 115 U.S. 620 (1885); see also *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 311 (1945).

[5] Louisiana stands alongside 21 states which revised the statute of limitation with a time-limited Revival Window. *See* https://childusa.org/2022sol/. The overwhelming majority of those jurisdictions have successfully revived previously time-barred childhood sexual abuse claims with a similar lookback window, discovery rule or by extended age limit. Revival laws for childhood sexual abuse claims have been explicitly upheld as constitutional in at least 12 states. *See Deutsch v. Masonic Homes of Cal., Inc.,* 164 Cal.App.4th 748, 752, 759, 80 Cal.Rptr.3d 368 (Cal. Ct. App.2008); *Doe v. Hartford Roman Cath. Diocesan Corp.,* 317 Conn. 357, 406 (2015); *Sheehan v. Oblates of St. Francis de Sales,* 15 A. 3d 1247, 1258-60 (Del. 2011); *Harvey v. Merchan,* 311 Ga. 811 (2021); *Roe v. Ram,* No. CIV. 14-00027 LEK-RL, 2014 WL 4276647, at *9 (D. Haw. Aug. 29, 2014); *Shirley v. Reif,* 260 Kan. 514, 526, 920 P.2d 405, 413 (1996); *Sliney v. Previte*, 473 Mass. 283, 41 N.E. 3d 732, 737-739 (2015); *K.E. v. Hoffman*, 452 N.W. 2d 509, 513-14 (Minn. 1990); *Cosgriffe v. Cosgriffe,* 262 Mont. 175 (1993) review denied, 362 Or. 389, 411 P.3d 382 (2018); *DeLonga v. Diocese of Sioux Falls,* 329 F.Supp. 2d. 1092, 1104 (S.D. S.D. 2004); *Kopalchick v. Cath. Diocese of Richmond,* 274 Va. 332, 337, 645 S.E2d 439 (2007).

prohibited enactment of retroactive laws.[6] Since Louisiana's Constitution does not forbid the enactment of retroactive laws,[7] the state's Due Process challenge represented the only realistic path available to this Defendant and others to overturn the Revival Provision.

That path was foreclosed when the Louisiana Supreme Court rejected the Due Process challenge in *Bienvenu II*. As a result, Defendant has filed the subject Motion to Dismiss which repackages the failed Due Process argument into a Takings Clause argument. While it is true that courts have sometimes seen fit to apply both Due Process and Takings Clause analyses to the same statute, the United States Supreme Court has remarked on multiple occasions that when a particular statute has *already* satisfied Due Process review, it would be "surprising indeed to discover" that the same statute nonetheless violated the Takings Clause. *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 223 (1986) ("*Connolly*"); *Concrete Pipe & Prods. v. Const. Laborers Pen.,* 508 U.S. 602, 641 (1993) ("*Concrete Pipe*").

Nevertheless, Defendant has leveled Takings Clause challenges. To do so, Defendant has cut corners, carefully excising critical phrases and concepts from its recitations of the applicable legal standards, asserting multiple self-serving omissions and half-truths.

---

[6] See e.g. *In re Matter of World Trade Ct. Lower Manhattan Disaster Site Lit.*, 30 N.Y.3d 377, 400 (Ct. App. N.Y. 2017) (rejecting Due Process challenge to a revival provision); *Starnes v. Cayouette*, 244 Va. 202 (1992) (striking down a revival provision due to Virginia law which prohibited enactment of retroactive laws); *Roe v. Doe*, 59 Haw. 259, 581 P.2d 310 (1978) (rejecting a Due Process challenge to revival of previously time-barred paternity suits); *Aurora Pub. Sch. v. A.S.*, 2023 CO 39, 531 P.3d 1036 (2023) (Colorado Supreme Court held that the Colorado revival provision violates the Colorado state constitutional prohibition on retrospective legislation, if it creates, eliminates, or modifies vested rights or liabilities).

[7] See *Long v. Ne. Soil Conservation Dist. of La.*, 226 La. 824, 833 (1954).

b.  **The Right to a Time-Bar Defense Against a Tort Claim is Not a Recognized Species of Property for Purposes of Federal Takings Clause.**

i.  *Defendant Fails to Engage with the Threshold Question of Whether the Right at Issue Triggers Takings Clause Protection.*

Defendant refuses to even acknowledge the threshold question that must be answered in every Takings Clause analysis: is the property right at issue the *type* of property right that triggers Takings Clause protection? By ignoring this question, Defendant's entire argument is built on a false premise–the mistaken assumption that all property rights entitled to due process protection are also entitled to Takings Clause protection. [R. Doc. 9-1 at 6]. Without any basis, Defendant claims that because *Bienvenu II* confirmed that the right to assert a time-bar defense is "property" within the scope of the Due Process clause, Defendant must be entitled to compensation under the Takings Clause. In essence, Defendant views *Bienvenu II* as a coupon entitling it to reimbursement by the state for what it may owe to the Survivors because of Defendant's own wrongful conduct.

However, it is often noted that the term "property" as used in the Fifth Amendment is a term of art which is "defined much more narrowly than in the due process clauses." *Corn v. City of Lauderdale Lakes*, 95 F.3d 1066, 1075 (11th Cir. 1996) (citing *Pittman v. Chicago Bd. of Educ.,* 64 F.3d 1098, 1104 (7th Cir.1995), *cert. denied,* 517 U.S. 1243 (1996); *Pro–Eco, Inc. v. Board of Comm'rs of Jay County, Ind.,* 57 F.3d 505, 511, n. 6 (7th Cir.), *cert. denied,* 516 U.S. 1028 (1995); and *Scott v. Greenville County,* 716 F.2d 1409, 1421–22 & n. 20 (4th Cir.1983) (holding that entitlement to a building permit was "property" protected by due process clause but not "property" protected by takings doctrine)).

Further, the mere fact that a particular property right can be described as a "vested property right" is insufficient to establish entitlement to Takings Clause protection. *See id*, 95 F.3d at 1076 (stating that a plaintiff cannot successfully establish "a just compensation claim simply by showing

11

denial of a vested right" and holding that the right at issue there, which had been deemed a vested property right by the state court, nonetheless was not a recognized species of property right for purposes of the Takings Clause).

> ii.     *The Takings Clause Primarily Applies to Land and Physical Things or Incorporeal Rights Directly Tied Thereto.*

While the Federal Takings Clause was initially designed to prevent the government from seizing ownership of or physically invading privately owned real property and other physical things, its scope was eventually enlarged to provide protection to intangible rights connected to such things. See *U.S. v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) (explaining that for purposes of the Takings Clause, "property" is defined as "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it."). In short, "[t]akings claims are recognized as to both personal property, including goods, and real property." *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *13 (W.D. La. Sept. 30, 2024).

Defendant identifies the "property" as the right to assert "the defense of accrued prescription" against the tort claims of Survivors. [R. Doc. 9-1 at 5]. However, Defendant's right to assert prescription is neither land or a physical thing nor a right directly tied to land or any physical thing. It is instead a right to assert a time-bar defense in a lawsuit which does not fall within the scope of the Takings Clause. As such, Defendant cannot meet its burden to prove, clearly and convincingly, that it has "property" for purposes of the Takings Clause.

> iii.    *Courts are Very Reluctant to Expand Takings Clause Protection Beyond its Traditional Scope.*

Only on rare occasions and for compelling reasons have courts expanded the scope of the Takings Clause to include property interests unrelated to land or other tangible property. On occasion, courts have expanded the scope of the Takings Clause to include interests earned on

accounts of money[8] as well as certain investment-backed intellectual property rights.[9] Overall, courts have been careful to resist expanding the definition of property too far beyond its origins. For example, in 2013, the United States Court of Appeals for the Fifth Circuit rejected an argument made by a homeowner's association that its right to collect assessments from owners of townhomes was a "compensable property interest" under the Takings Clause. *U.S. v. 0.073 acres of land, more or less, situated in Pars. of Orleans & Jefferson, La.*, 705 F.3d 540, 549 (5th Cir. 2013). Recognizing the rights at issue "as compensable under the Takings Clause would allow parties to recover from the government for condemnations that eliminate interests that do not stem from the physical substance of the land" and "would unjustifiably burden the government's eminent domain power." *Id.* at 549.

> iv.     **The Right to Assert a Time-Bar Does Not Have the Traditional Indicia of Property Rights That Fall Within Takings Clause Protection.**

When analyzing non-traditional types of property to determine whether they can be recognized as a species of property for purposes of the Takings Clause, the United States Supreme Court has found it proper to consider whether the property at issue has "the characteristics of more tangible forms of property." *Ruckelshaus*, 467 U.S. at 1002. The Court looked to whether the property extended beyond land and tangible goods and included "the products of an individual's labour and invention." *Id.* (internal citations omitted). Similarly, the United States Court of Appeals for the Fifth Circuit looked to whether the right at issue could be bought and sold like traditional property or whether it carried attributes which are more "in the nature of a personal

---

[8] See e.g. *Phillips v. Washington Legal Found.*, 524 U.S. 156 (1998); *Webb's Fabulous Pharmacies, Inc., v. Beckwith*, 449 U.S. 155 (1980).

[9] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (holding that trade secrets were only "property" within the meaning of the Takings Clause if they were "investment-backed.").

privilege or license." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 273 (5th Cir. 2012).

The United States Supreme Court has long noted that the Takings Clause does not operate as a guarantee to property owners that currently existing law will remain unchanged. *Mugler v. Kansas*, 123 U.S. 623 (1887). Accordingly, while statutory entitlements *are* typically deemed to be a recognized species of property right for purposes of the Due Process clause,[10] they are not for purposes of the Takings Clause. *Bowen v. Gilliard*, 483 U.S. 587 (1987). Courts have noted that "[i]f a statutory benefit could not be rescinded without the payment of compensation to the beneficiaries, it would be extremely difficult to amend or repeal statutes." *Pittman*, 64 F.3d at 1104–05.

Here, while the right to assert a time-bar defense is "property" for purposes of the Due Process clause, Defendant has not provided any serious argument that this procedural right carries the indicia of traditional Takings Clause-protected property. Defendant does not argue that the right is a "product" of its labor or that it's a right that can be bought or sold. [R. Doc. 9-1].

Instead, time-bar defenses are akin to a statutory entitlement or a personal privilege or license. Time-bar defenses are benefits granted by statute "accorded by law for reasons of public expediency." *Campbell*, 115 U.S. at 625. They "are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay." *Picone v. Lyons*, 601 So. 2d 1375, 1376 (La. 1992) (citing *Chase Secs. Corp.*, 325 U.S. at 314). "They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of

---

[10] See e.g. *Goldberg v. Kelly*, 397 U.S. 254 (1970).

14

the individual" *Id*. As time-bar defenses are rights created through legislation, "the legislature may create, shorten, lengthen or abolish [time-bar defenses] at its discretion." *Id*.

Defendant has made no attempt to argue that existing Louisiana or federal law recognizes the right to assert prescription, or any other litigation defense, as a species of property protected by the Takings Clause. Defendant is essentially requesting that this Court dramatically expand the meaning of the term "property" to include litigation defenses as compensable property for Taking Clause protection.

> **v.      *Expanding the Takings Clause Definition of "Property" to Include Rights to Assert a Remedy Would Freeze the Courts in Time.***

Historically, Louisiana law has held that the legislature has the right to alter remedies at will, including retroactively creating new remedies and repealing existing remedies.[11] And on multiple occasions, the Louisiana Legislature has successfully revived time-barred causes of action, including claims which prescribed peremptively.[12] The Louisiana Supreme Court has held that retroactively altering the prescriptive period applicable to an entire set of claims is an "appropriate" function of the legislature, even when it upsets a party's reasonable expectations.[13]

---

[11] See e.g. *Schwing Lumber & Shingle Co. v. Peterman*, 140 La. 71 (1916); *Picone v. Lyons*, 601 So. 2d at 1376; *Morgan's La. & T.R. & S.S. Co. v. R.R. Comm'n of La.*, 138 La. 377, 381 (1915).

[12] See e.g. 1993 La. Sess. Law Serv. Act 32 (H.B. 897) (Opening up a 180 day revival window for previously prescribed paternity disavowal actions); 1997 La. Sess. Law Serv. Act 1110 (S.B. 1128) (Opening up another 180 day revival window for previously prescribed paternity disavowal actions); *State ex rel. La. Dep't of Educ.-Food Serv. v. Bright Beginnings Child Care, Inc.,* 42, 145 (La. App. 2 Cir. 5/16/07), 957 So. 2d 362*; State v. Schnyder*, 06-29 (La. App. 5 Cir. 6/28/06), 937 So. 2d 396, 399, n.1; *Smith v. Avant Garde Homeowners Ass'n, Inc.*, 06-427 (La. App. 5 Cir. 10/31/06), 945 So. 2d 89; *State v. Williams*, 06-443 (La. App. 5 Cir. 10/31/06), 945 So. 2d 106; See e.g.,2005 La. Sess. Law Serv. 1st Ex. Sess. Act 6 (H.B. 90); LA. REV. STAT. § 9:406; see *Barras v. O'Rourke*, 2019-412 (La. App. 3 Cir. 12/18/19), 287 So. 3d 817, 819.

[13] *State v. All Prop. & Cas. Ins. Carriers Authorized & Licensed to Do Bus. in State*, 2006-2030 (La. 8/25/06), 937 So.2d 313, n. 13 (in a case where the legislature enacted a statute that retroactively changed the prescriptive period for an entire set of claims because many, though not all, of them could likely establish valid *contra non valentem* exceptions, the Louisiana Supreme Court deemed this to be "appropriate" method for avoid the "mass confusion and an increase in filings in our courts" that would come from litigating those exceptions on a case-by-case basis for each and every claim. The Court upheld the statute as constitutional against a contract clause challenge despite even though the statute substantially impaired the defendants contractually vested and constitutionally protected right to assert the one-year liberative prescription period to which all parties had contractually agreed).

Expanding the Takings Clause's definition of "property" to include remedial and procedural rights which a litigant acquired through legislative grant or operation of law would dramatically extend the reach of the Fifth Amendment. Statutes which alter existing procedures or remedies inevitably benefit one litigant at the expense of the other, which could lead to endless loops of "takings" challenges by both plaintiffs and defendants. These challenges would ultimately curb the legislature's power to enact reasonable laws that promote effective operation of the courts.

As noted above, Plaintiff must demonstrate that it has a protectable property interest. *Dennis Melancon, Inc.* 703 F.3d at 269 (5th Cir. 2012) (internal citations omitted). Defendant failed to meet the heavy burden that a time-bar defense, unrelated to any land or other physical thing, falls within the scope of the term "property" for purposes of the Takings Clause.

### c. The Public Purpose Requirement is Met Wherever, As Here, The Police Power Was Used to Enact a Law.

Defendant has alleged that the Revival Provision violates the "public purpose" requirement of the Takings Clause. [R. Doc. 9-1 at 5]. In support of this argument, Defendant states: "[t]he entire revival provision is concerned with reviving private causes of action by private individuals and, correspondingly, strips potential defendants of their private rights to prescription." *Id.*

To support its argument, Defendant haphazardly inserted the word "private" before every noun it uses and provided this court with citations exclusively to cases decided more than one-hundred years ago, in a 12-year window of time between 1885 and 1897. [R. Doc. 9-1 at 6]. Defendant's proffer of old legal precedent and repeated insertion of the word "private" cannot change either of the two facts which render Defendant's "private purpose" argument a non-starter.

First, the United States Supreme Court has consistently defined "public use" quite expansively such that almost any non-arbitrary exercise of the state's police power will qualify as a "public use." *Hi. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240-41 (1984) (holding that the "'public

use' requirement is thus coterminous with the scope of a sovereign's police powers" and that a taking should be upheld as consistent with the public use requirement as long as it is "'rationally related to a conceivable public purpose.'"). Just as the United States Supreme Court defined the "public purpose" requirement extremely broadly, it has noted that the judiciary's role in reviewing that power is "extremely narrow." *Berman v. Parker*, 348 U.S. 26, 32 (1954).

Second, *Bienvenu II* already ruled that the Revival Provision has "a substantial relationship to public safety, morals and welfare" and was a valid exercise of the state's police power which serves at least three identified public purposes: "(1) the provision assists in identifying hidden child predators so children will not be abused in the future; (2) shifts the costs of the abuse from the victims and society to those who actually caused it; and (3) educates the public about the prevalence and harm from child sexual abuse to prevent future abuse." *Bienvenu II*, 386 So. 3d at 290-91.

Defendant has not made any good-faith argument that existing precedent regarding the meaning of "public purpose" should be ignored or extended. Nor has Defendant provided any basis upon which to overrule *Bienvenu II*'s holding regarding the public purpose of the Revival Provision. As such, Defendant's "private purpose" argument is neither backed by law, nor evidence, nor a good faith argument to extend the law.

### d. Defendant's Skillful Excision of Key Words and Concepts from *Apfel* Paints a Misleading Picture.

Defendant's heavy reliance on *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) (Kennedy, J., concurring in the judgment and dissenting in part) ("*Apfel*"), is misplaced [R. Doc. 9-1 at 10-12]. Defendant appears to be aware that *Apfel* is distinguishable, as evidenced by the way it has carefully spliced and rearranged the wording of the quotations it cites.

17

The law at issue in *Apfel* was the federal Coal Industry Retiree Health Benefit Act (the "Coal Act"), which required certain coal mining companies, including Eastern Enterprises ("Eastern"), to make monetary payments directly into a privately-operated fund which would then be used to pay the lifetime healthcare costs of retired coal miners. The plurality opinion in *Apfel*, which was joined only by four justices, determined that the Coal Act was an unconstitutional regulatory taking *as applied* to Eastern. *Id.* at 500. Here, Defendant claims that because four justices in *Apfel* found the Coal Act to be a taking, the Revival Provision must also be a taking.

Defendant strategically omits key elements of the Coal Act which differ significantly from the Revival Provision. Most importantly, the type of property taken under the Coal Act is completely different. Here, the "property" is the right to assert a time-bar defense but does not force a Survivor to file a lawsuit. The Revival Provision itself costs Defendant nothing. It simply allows a Survivor who claims that he or she was subjected to molestation as a result of a childhood sexual abuser's conduct to file a lawsuit. With respect to the lawsuits which are filed, Defendant retains all substantive defenses available to tort defendants. Just because a Survivor may file a lawsuit does not mean a defendant will be required to pay compensation. In contrast, the Coal Act required Eastern to pay money to former employees and its failure to pay within the time allowed would result in additional, severe monetary penalties. *Id.* at 529.

Further, the Coal Act imposed an entirely new obligation which required Eastern to pay lifetime health benefits for past employees. *Id*. at 500-501. This new obligation did not arise naturally under the principles of contract or tort law, but instead by government fiat. At the time the Coal Act passed, Eastern was no longer involved in the mining industry. *Id.* at 500. Further, when it was involved in mining, it had bargained with labor unions to reach an agreement limiting the scope of its liability for employee health benefits. *Id.* at 500.  As the plurality opinion notes, in

18

all of these negotiated agreements, unlike other mining companies, Eastern never agreed to pay lifetime health benefits to its employees. *Id.* at 500-501. Finally, the regulatory scheme created by the Coal Act resulted in Eastern being forced to pay more than its fair share of the burden of retiree health benefits compared to other mining companies. *Id.* at 501.

This central issue of proportionality was ignored by Defendant. Instead, Defendant quotes *Apfel* as having stated "[o]ur [sic] decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability," ignoring the crucial qualification in the same sentence. [R. Doc. 9-1 at 10]. In fact, the Court stated that retroactive legislation might be unconstitutional if it affects "a limited class of parties that could not have anticipated the liability, and if the extent of that liability is substantially disproportionate to the parties' experience." *Id.* at 500. This error of omission conceals the core concern of the justices in the *Apfel* plurality: disproportionality. This concern, coupled with the newness of the obligation imposed by the Coal Act and the disturbance of Eastern's bargained for investment-backed expectations, is what led four justices to conclude that the Coal Act violated the Takings Clause as applied to Eastern. *Id.* at 500-501.

Conversely, the Revival Provision does not create any new liability. Defendant's liability to Survivors arises naturally under the principles of obligations and tort due to Defendant's actions. The Revival Provision does not enlarge or expand that liability but, rather, temporarily removes a bar to recovery which Defendant has benefitted from many years. Defendant is not being asked to pay for more than its fair share of liability under the Revival Provision. Only if Defendant is found to be liable will it pay the amount of damages for which it is liable under general principles of tort law. The Revival Provision does not add any new claims or increase Defendant's liability.

Notably, five justices rejected the plurality's analysis and instead found that the Coal Act did not amount to a "taking" at all.[14] Justice Kennedy, concurring in part and dissenting in part, noted that when the constitutionality of an act "appears to turn on the legitimacy of Congress' judgment rather than on the availability of compensation . . . the more appropriate constitutional analysis arises under general due process principles rather than under the Takings Clause." *Id.* at 545. Here, under Justice Kennedy's analysis, the Louisiana Supreme Court has already determined that the Revival Provision is constitutional under the Due Process law not only under rational basis review, but also strict scrutiny. *Bienvenu II*, 386 So. 3d at 291-92.

### e. The Revival Provision Does Not Amount to a Regulatory Taking Because it Does Not Go Too Far.

#### i.     *Only Regulations which "Go Too Far" Amount to a Taking in the Constitutional Sense.*

Plaintiff maintains that Defendant's right to assert a time-bar defense does not even trigger Takings Clause protection at all. Assuming *arguendo* that the Takings Clause is triggered, the Revival Provision can only be considered a "taking" for purposes of the Fifth Amendment if it "goes too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). In determining whether a law or regulation goes "too far" and thus qualifies as a "regulatory taking," a court must conduct an "ad hoc" factual inquiry based on three factors set forth in the seminal case on regulatory takings analysis, *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 130–131 (1978).

Specifically, the three factors set forth in *Penn Central* are (1)"[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct

---

[14] Justice Kennedy joined the majority block because he found the Coal Act to be unconstitutional under the Due Process Clause by retroactively imposing a new liability upon Eastern for which it had never been responsible to remediate a threat—the perilous financial condition of the benefits fund—which Eastern played no role in causing. In his concurrence, he explicitly stated that the majority opinion's Taking Clause analysis was "incorrect." 524 U.S. at 539 (Kennedy, J., concurring in the judgment and dissenting in part).

investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124. As described more fully below, the *Bienvenu II* ruling has already decided all of the underlying legal and factual issues which are necessary for this Court to determine that the Revival Provision did not "go too far" and thus is not a "taking" in the constitutional sense.

> ### ii.    Penn Central *Factor 1: The "Economic Impact" of the Regulation on the Claimant Involves More Than Simply the Dollar Amount.*

Defendant notes that the first factor, the extent of the economic impact" is met as it "forced a considerable financial burden" on parties required to defend against previously prescribed claims. [R Doc. 9-1 at 11]. Defendant solely looks to the monetary value of the burden, which is only part of the consideration of the first factor and is not determinative. In fact, courts have found that even when a regulation results in severe diminutions in the value of claimant's property, that fact alone has been held "insufficient to demonstrate a taking." *Concrete Pipe*, 508 U.S. at 645.[15]

Instead, to properly analyze the first factor, it is necessary to understand the principles which underlies the regulatory takings doctrine. As the United States Supreme Court explained in *Andrus v. Allard*:

> [G]overnment regulation-by definition-involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of "justice and fairness" . . . But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one

---

[15] See also *Vill. of Euclid, Oh. v. Ambler Realty Co.,* 272 U.S. 365, 384 (1926) (approximately 75% diminution in value did not amount to a taking); *Hadacheck v. Sebastian,* 239 U.S. 394, 405 (1915) (87.5% diminution in value did not amount to a taking); *Palazzolo v. R. I.*, 533 U.S. 604, 631 (2001) (regulation reducing development value of 18 acre tract of land to $200,000 does not leave property "economically idle" and is not a "token interest").

> "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety.

*Andrus v. Allard*, 444 U.S. 51, 65 (1979) (internal citations omitted). Therefore, the court must look more generally to the elements of fairness and justice which affect the economic impact. In *Apfel*, the Court emphasized that any new obligation imposed should be *proportional* to the claimant's experience and linked to the claimant's conduct. *Apfel*, 524 U.S. at 500 and 530. In *Apfel*, the Court determined that the Coal Act was not fair or proportional as applied to Eastern because "the correlation between Eastern and its liability to the [health benefits fund] is tenuous." *Apfel*, 524 U.S. at 531.

The *Apfel* opinion was guided by prior Supreme Court cases involving "similar legislative schemes" which retroactively altered litigants' liabilities. *Apfel*, 524 U.S. at 500. Only two of those cases involved Takings Clause challenges,[16] and in both cases the Supreme Court had determined that "Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties; and that it may impose retroactive liability to some degree." *Apfel*, 524 U.S. at 500. But as *Apfel* noted, those prior cases made it clear that when judging the severity of the economic impact, it is not only the size of the impact but also the proportionality of the impact that should be considered. *Id.* at 530. In the cases cited by *Apfel*, the Court found the law in question not to be a taking because there was "'nothing to show that the withdrawal liability imposed on an employer will always be out of proportion to its experience with the pension plan.'" *Id.* (citing *Connolly*, 475 U.S. at 212 (1986)). Proportionality is a critical consideration because "[t]he purpose of forbidding uncompensated takings of private property for public use is 'to bar Government from forcing some people alone to bear public burdens which, in

---

[16] *Connolly,* 475 U.S. 211 (1986); and *Concrete Pipe & Prods. of California, Inc.,* 508 U.S. 602.

all fairness and justice, should be borne by the public as a whole.'" *Connolly*, 475 U.S. at 227 (citing *Armstrong v. U.S.*, 364 U.S. 40, 49 (1960)).

Here, Defendant argues that the economic impact of the Revival Provision is sizeable because "dozens of sexual abuse tort claims have been filed around the State of Louisiana," forcing Defendant and other employers of alleged childhood sexual abusers to spend "significant resources on legal fees and costs to defend themselves from such claims." [R. Doc. 9-1 at 11]. While it is true that multiple lawsuits have been filed in accordance with the Revival Provision, the total number of claims against this Defendant and any other Catholic organization will only amount to a small fraction of the total number of Survivors who been molested as a result of their actions. The Louisiana Supreme Court in *Bienvenu II* noted that "child sexual abuse is a unique tort in which the average victim does not come forward until they are 52 years old." *Bienvenu II*, 386 So. at 291. Until the 1980s, Defendant enjoyed the benefits of the default 1-year prescription statute. Between the 1980s and 2021, the longest possible prescriptive period that could apply to a Survivor expired when the Survivor turned 28 years old.[17] Nearly every Survivor in Louisiana lost their right to pursue justice before ever reaching the age by which the average Survivor first comes forward. Further, childhood sexual abuse has been proven to shorten the lifespan of those who experience it. One study, published in a major medical publication found childhood sexual abuse survivors have a 2.6 times higher risk of dying in middle age (between age 45 and 58) than their non-abused peers.[18] Until this Revival Provision was enacted, many Survivors passed away without access to justice.

---

[17] Between 1995 and 2021, Louisiana law allowed Survivors to file a lawsuit at any time prior to the date they turned 28 years old. LA. REV. STAT. § 9:2800.9.

[18] Rogers N.T., Power C., Pinto Pereira S.M. *Child maltreatment, early life socioeconomic disadvantage and all-cause mortality in mid-adulthood: findings from a prospective British birth cohort*. BMJ Open 2021; https://pubmed.ncbi.nlm.nih.gov/34551950/.

The enormity of the windfall this Defendant enjoyed as a result of these staggeringly unfair prior prescription periods is almost impossible to overstate, as is the enormity of the harm done to society at large. Many of the Survivors who would have brought claims under the Revival Provision have already passed away. Those Survivors were owed compensation that Defendant will never pay. Further, even many of the living Survivors will be emotionally or mentally unable to take advantage of the Revival Provision. As Representative Hughes stated in the legislative proceedings related to the Revival Provision "studies suggest many victims, as much as 33% never disclose their abuse to anyone." Rep. Jason Hughes, May 3, 2021, Hearing at the House of Representatives, Bill 492, at 5:11-7:4. Based on this statistic, this Court can assume that at least 30% of Survivors living today will not file a lawsuit. There is no doubt that the number of Survivors who sue Defendant will amount to a small fraction of the Survivors molested due to Defendant's conduct.

The monetary amount Defendant may have to pay to Survivors will pale in comparison to the societal impact Defendant and other Catholic Organizations have caused because of the actions of its employees. The effects that Survivors endure are severe and long lasting. Survivors are four times more likely to abuse drugs, four times more likely to experience PTSD, and three times more likely to experience major depressive episodes as adults.[19]

Lastly, Defendant's liability to the Survivors who file suits under the Revival Provision will be directly proportional to the harm it caused due to its actions, as Defendant will only be liable for the actions proven by Survivors throughout the state. Under the first factor, as explained above, the Revival Provision comports with the values of fairness and justice which guides this

---

[19] RAINN, *Children and Teems: Statistics*, https://www.rainn.org/statistics/children-and-teens.

Court's analysis.  Defendant has failed to prove that the economic impact of the Revival Provision goes "too far."

### iii.    Penn Central *Factor 2: There is no Evidence that the Regulation Interferes with Defendant's Reasonable Investment Backed Expectations.*

The United States Supreme Court has deemed the second factor, whether the regulation at issue interferes with "reasonable investment-backed expectations" of the claimant, "particularly" important to the *Penn Central* analysis. *Palazzolo*, 533 U.S. at 617; *Penn Cent.*, 438 U.S. 104 at 124.  Defendant conveniently alters the language of the second factor, omitting the phrase "investment-backed" from the entirety of its brief. Even where Defendant cites to cases, it splices out the pertinent language, arguing the second factor merely considers the extent to which the regulation interferes "with the party's expectations," [R. Doc 9-1 at 11-13] without any reference to consideration of whether those expectations were backed by reasonable investments. Acknowledging the existence of the language of the second factor would lead to the obvious question: did Defendant (and other Catholic Organizations) make any investments to ensure that the time-bar defense remain in place?

In *Apfel*, the Court addressed this second factor by noting that decades prior to the passage of the Coal Act, Eastern had repeatedly engaged in collective bargaining negotiations between the employee union and other coal companies to reach a series of compromise agreements limiting the extent of Eastern's liability for coal miners' healthcare. *Apfel*, 524 U.S. at 531. None of those bargains include a promise by Eastern to pay lifetime benefits. *Id*. Therefore, the sudden imposition by the government of a new obligation requiring Eastern to pay these benefits caused too great an interference with its reasonable investment-backed expectations by "attach[ing] new legal consequences to [an employment relationship] completed before its enactment." *Id.* at 532 (citing

25

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994)). The focus in *Apfel* was not on the mere fact that the law was retroactive, but on the fact that by enacting the law, the government had imposed an entirely new obligation which arose not naturally, but by government fiat and which upset the contractual liability obligations Eastern had bargained for, invested in, and agreed-upon. *Id.* Likewise, in the two cases involving similar statutory schemes that *Apfel* cited, *Concrete Pipe* and *Connolly*, the claimants also had investment-backed interests which had been specifically bargained for resulting in contractual agreements that congress sought to retroactively disturb.[20]

Here, there is no evidence that Defendant bargained for anything. There was no negotiation or compromise with the Survivors. Defendant has not argued that it invested effort or capital to secure their right to a time-bar defense. Instead, they were granted a privilege to assert an arbitrary defense due to the mere passage of time which was arbitrarily chosen by the legislature in the 1980s. Defendant cannot meet the second factor, that the regulation interfered with its "reasonable investment-backed expectations."

           **iv.**    **Penn Central *Factor 3: The Character of the Governmental Action Weighs in Favor of Constitutionality.***

The third factor requires the court to look at the "character of the governmental action." *Penn Cent.*, 438 U.S. at 124. In explaining this factor, the Supreme Court stated that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* It further explained

---

[20] Both *Connolly,* 475 U.S. at 212, and *Concrete Pipe & Prods. of Ca., Inc.*, 508 U.S. at 603, conducted Takings Clause analyses of the MPPAA which had created a statutory pension scheme which retroactively nullified a contractual provision limiting employer liability. In so doing, the law retroactively imposed additional obligations causing companies to incur significant liability beyond what the companies had agreed to in collective-bargaining and trust agreements. In both cases, the Supreme Court ruled that despite severe negative impact on the private parties involved, the regulation did not amount to a "taking" at all for purposes of the Takings Clause.

"[m]ore importantly for the present case, in instances in which a state tribunal reasonably concluded that the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Id.* at 125.

The idea that reasonable laws which are enacted through the police power in order to address a threat to public welfare do not constitute a "taking" and therefore do not warrant compensation predates the existence of regulatory takings doctrine. *Mugler*, 123 U.S. at 668–69.[21] No bright line rule has been created but, as a practical matter, nearly every instance where a legislature utilized its police power to enact a law intended to curtail an existing public welfare threat, the courts determine that no constitutional "taking" had occurred.[22]

Defendant's use of *Apfel* to support that the third factor weighs in favor of declaring the Revival Provision unconstitutional is misplaced. In *Apfel*, the property at issue (Eastern's financial resources) was not being used in a way that caused a threat. Here, the alleged property at issue (the right to assert a time-bar defense) has been used to prevent Survivors from accessing federal and state courts to obtain some measure of compensation for the harmful sexual abuse they endured as a child. The effect of preventing Survivors from coming forward is the loss of the opportunity to identify and catch hidden child predators so that they can be prevented from molesting other children in the future. As the Court in *Bienvenu II* determined, one of the compelling purposes behind the Revival Provision is to address that exact threat by reopening that legal platform and

---

[21] The Court in *Muglar* noted that "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit."

[22] See *id.* (law prohibiting the manufacture of alcoholic beverages); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (law barring operation of brick mill in residential area); *Miller v. Schoene*, 276 U.S. 272 (1928) (order to destroy diseased cedar trees to prevent infection of nearby orchards); *Goldblatt v. Hempstead*, 369 U.S. 590 (1962) (law effectively preventing continued operation of quarry in residential area).

thereby "assist[ing] in identifying hidden child predators so children will not be abused in the future." *Bienvenu II*, 386 So. 3d at 291.

Yet again, Defendant ignores the purpose of the third factor and requests that this Court hold that the Revival Provision is unconstitutional because it "'singles out certain employers to bear a substantial burden, based on the employers' conduct far in the past.'" [R. Doc. 9-1 at 12]. Once again, Defendant has omitted a key phrase to misguide this Court. In *Apfel*, the Court provided that: "the nature of the governmental action in this case is quite unusual in that Congress' solution to the grave funding problem that it identified singles out certain employers to bear a substantial burden, based on the employers' conduct far in the past, *and unrelated to any commitment that the employers made or to any injury they caused.*" *Apfel*, 524 U.S. at 501–02 (emphasis added).

The last clause of the sentence cited by Defendant renders the analysis in *Apfel* inapplicable. In *Apfel*, the law forced Eastern to pay monetary amounts to compensate persons for injuries that Eastern never caused. *Apfel*, 524 U.S. at 501-02. Here, the Revival Provision only requires a party to pay damages if that defendant actually caused the damage through its own actions. Defendant's obligation is wholly related to the injury it caused. The only thing that the Revival Provision has done is temporarily restrict Defendant's right to bar the plaintiff from seeking the compensation he was always owed.

Considering the foregoing, Defendant has failed to prove that any of the three factors of *Penn Central* weigh in favor of finding the Revival Provision unconstitutional. Given Plaintiff's heavy burden, proving that the legislation is unconstitutional clearly and convincingly, this Court should deny the Motion to Dismiss based on the federal Takings Clause.

## B.  THE LOUISIANA TAKINGS CLAUSE

### a.  The Louisiana Takings Clause Has Never Required "Just Compensation" to be Paid for Destruction of Property Caused by Reasonable Restrictions Enacted Through the State's Police Power For the Public Welfare.

Article I, Section 4 of the Louisiana Constitution (the "Louisiana Takings Clause") states that "[e]very person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power." LA. CONST. ANN. art. I, § 4(A).[23]

One exception to the requirement to pay "just compensation" for constitutionally significant takings of private property has remained consistent throughout Louisiana history: when the legislature enacts laws that places reasonable restrictions upon private property for the sake of the public health, safety, morals, and welfare, the government need not compensate the property owner for their losses.[24] The Louisiana Supreme Court has long recognized that "uncompensated obedience to a regulation enacted for the public safety under the police power of the state is not a

---

[23] While this Section of the Louisiana Constitution was not enacted until 1974, the requirement to pay just compensation when it takes private property was found in the Due Process Clause of Article I, Section 2 "No person shall be deprived of life, liberty, or property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." And Article IV, Section 15 "No *ex-post facto* law, nor any law impairing the obligation of contracts, shall be passed; nor shall vested rights be divested, unless for purposes of public utility, and for just and adequate compensation previously paid." 1921 LA. CONST. ANN. art. I, § 2; 1921 LA. CONST. ANN. art. IV, § 15.

[24] See e.g. *State v. Payssan*, 47 La. Ann. 1029 (1895) ("One has, in so far as relates to health and cleanliness, in which the public is concerned, the right only to a reasonable use of his property. He is expected to endure a reasonable amount of discomfort and annoyance for the public good, without compensation."); *City of New Orleans v. Murat*, 119 La. 1093 (La. 1907) (which upheld new zoning laws changing limits on the permissible locations of dairies, even though the effect of the law was to divest dairymen who had lawfully established dairy farms under prior zoning laws of their "vested right to remain in that location" without compensation because the zoning law was a valid exercise of police power); *City of New Orleans v. New Orleans Pub. Serv.*, 168 La. 984 (1929), aff'd, 281 U.S. 682 (1930) (upholding act ordering destruction of privately-owned viaduct for public purpose); *City of New Orleans v. Charouleau*, 121 La. 890 (1908) (upholding law directing seizure and destruction, without compensation, of vested property right to dairy cows potentially infected with tuberculosis).

taking of property without due compensation." *City of Shreveport v. Kansas City, S. & G. Ry. Co.*, 167 La. 771, 781 (1929). This principle is still relied upon by the Louisiana Supreme Court in analyzing takings claims. *Faulk v. Union Pac. R.R. Co.*, 2014-1598 (La. 6/30/15), 172 So. 3d 1034, 1052.

Like the Federal Takings Clause, Louisiana's Takings Clause recognizes the concept of "regulatory takings." As Defendant acknowledges, its Louisiana Takings Clause challenge must be analyzed under the three-pronged analysis set forth in *State through Dep't of Transp. & Dev. v. Chambers Inv., Inc.*, 595 So.2d 598, 602 (La. 1992) ("*Chambers*"). If Defendant fails to prove any one of the three prongs, it has failed to prove a taking and this Court need not continue with the remainder of the analysis. *Avenal v. State*, 2003-3521 (La. 10/19/04), 886 So. 2d 1085, 1104.

The Louisiana Takings Clause is functionally similar to its federal counterpart. Although Louisiana courts "do not apply U.S. Supreme Court decisions mechanically to state law issues . . . . such decisions serve as guideposts, and [courts] use them 'if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees.'" *Faulk*, 172 So.3d at 1056, n. 33 (citations omitted). As was true under the federal Takings Clause analysis, the elements underlying legal and factual elements necessary to assess this state takings clause challenge have already been decided by *Bienvenu II*.

   **b. Louisiana Takings Clause Prong 1: The Right to A Remedy is not the Type of Property that Triggers Louisiana Takings Clause Protection Because the Clause was Designed to Protect Land and Other Tangible Property.**

Defendant states that the first prong of this analysis requires the court to "determine whether a property right is at issue." [R. Doc. 9-1 at 7-8]. Once again, Defendant omits critical

language, as the cases cited by Defendant require that the Court determine whether a person's legal right *with respect to a thing or an object* has been affected.[25]

In *Chambers*, Justice Dennis notes that "in both the state and federal constitutions, the ambiguous word *property* is always used without further definition." *Chambers*, 595 So. 2d at 601. In great detail, Justice Dennis explains that in the context of Takings Clause, the term "property" initially referred only to physical invasions of corporeal property, which led to "the early popular notion" that there could be "no taking without a touching." *Id.* at 601. Judge Dennis adds that "[a]lthough the physical concept still exerts a heavy influence in some opinions, the trend has been away from a touching requirement, with increasing acceptance of the possibility of takings without any physical invasion." *Id*. He explains that this expansion of the term applies to incorporeal rights which relate to land and other physical things, including "street access, riparian rights, easements and servitudes, restrictive covenants, and lateral support as forms of *property." Id.* at 602. Within this context, it is clear that when Justice Dennis notes that "it is now hornbook law that *any* substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of federal and state constitutions," he is using "property" as a term of art referring to corporeal property, as well as the various incorporeal rights pertaining to that corporeal property. *Id.*

This limited definition of "property" for purposes of the Takings Clause appears all throughout Louisiana jurisprudence. In *Faulk*, the Louisiana Supreme Court provides guidance on

---

[25] *City Bar, Inc. v. Edwards*, 2021-1437 (La. App. 1 Cir. 8/30/22), 349 So. 3d 22, 31, writ denied, 2022-01475 (La. 11/22/22), 350 So. 3d 498, *reconsideration not considered*, 2022-01475 (La. 2/7/23), 354 So. 3d 661 (stating that "[t]he first prong involves a determination of whether a person's legal right with respect to a thing or an object has been affected; in this part of the analysis, a court must be able to identify a recognized species of private property right that has been affected;"); *State Through Dep't of Transp. & Dev. v. Chambers Inv. Co.*, 595 So. 2d 598, 603 (La. 1992) (stating "Under this analysis, we must first determine if a person's legal right with respect to a thing or an object has been affected. In other words, we must be able to identify a recognized species of private property right that has been affected").

how to determine whether the property right at issue is a "recognized species of property right" for purpose of the Louisiana Takings Clause. *Faulk*, 172 So. 3d at 1044. First, the Court noted that the predominant property right is ownership, where the owner can "use, enjoy, and dispose of it within the limits and under the conditions established by law." *Id*. In other cases, Louisiana courts have turned to Louisiana's legal definition of "ownership" to determine whether the property at issue is a species of property right which triggers Louisiana Takings Clause protection.[26] The Louisiana Supreme Court has explained that the species of property which triggers the "just compensation" requirement under the Louisiana Constitution is "the right of ownership or one of its recognized dismemberments." *Columbia Gulf Transmission Co. v. Hoyt*, 252 La. 921, 935 (1968). Where a claimant failed to set forth the taking of a "right of ownership or dismemberment thereof," their takings clause claim has been rejected. *Culotta*, 316 So. 2d at 465-66.

Here, Defendant states that the property right at issue is "right to an accrued prescription defense" [R. Doc. 9-1 at 9]. By Defendant's own description, the "property" is neither real property nor an "object or thing." Further, it is not an incorporeal right *tied to* real property or an object or thing. Defendant's sole argument is that because *Bienvenu II* labeled the defense of accrued liberative prescription a "vested property right" for purposes of the Due Process Clause, it automatically falls within the purview of the Louisiana Takings Clause as well, which is undermined by the above jurisprudence.

Defendant's half-hearted attempt to liken the Revival Provision to the executive order at issue in *City Bar, Inc., v. Edwards* does nothing to further Defendant's case. *City Bar* involved a class action lawsuit filed by local bar owners against then Governor John Bel Edwards seeking

---

[26] See e.g. *State Through Dep't of Transp. & Dev. v. Chambers Inv. Co.*, 595 So. 2d 598, 603 (La. 1992); *Lowenburg v. Sewerage & Water Bd. of New Orleans*, 2019-0524 (La. App. 4 Cir. 7/29/20), 387 So. 3d 548, 562; *Culotta v. Police Jury of Ascension Pa.*, 316 So. 2d 463, 465-66 (La. Ct. App.), writ refused, 320 So. 2d 561 (La. 1975).

just compensation for losses they incurred due to a series of executive orders issued during the COVID-19 pandemic which forced bars to remain shuttered for significantly longer periods of time than other businesses, thereby causing a severe economic impact to bar owners. 2021-1437 (La. App. 1 Cir. 8/30/22); 349 So. 3d 22, 25-26, *writ denied,* 2022-01475 (La. 11/22/22); 350 So. 3d 498, *reconsideration not considered,* 2022-01475 (La. 2/7/23); 354 So. 3d 661.

The bar owners argued that this amounted to a taking because it "deprived them of the lawful use of their permits, in particular, the right to sell alcohol for on-premises consumption." *Id.* at 26. In addition to the glaring differences in the nature of property at issue in *City Bar*, the bar owners bore no legal responsibility for the pandemic and credibly alleged that they were being unfairly singled out to bear a disproportional burden of the losses as compared to other similarly situated businesses and the general public. *Id.* It was ultimately the argument regarding the disproportionality of the burden that allowed the bar owners to narrowly survive the exception of no cause of action. *Id.* at 33.[27]

Here, Defendant has not met its burden of proving, clearly and convincingly, that the Revival Provision is unconstitutional under the Louisiana Takings Clause. Defendant does not cite to a case where the Louisiana Takings Clause was applied to a procedural or remedial right that is not related to land or some other physical thing. The only cases involving incorporeal rights were *directly related* to land.[28] Because Defendant has utterly failed to prove that the right to assert a time-bar defense is a species of property right entitled to protection under the Louisiana Takings Clause, its Louisiana Takings Clause challenge must be rejected.

---

[27] The court specifically noted that due to the procedural posture it could decide only whether the proper elements had been alleged and was prohibited from "evaluating the likelihood that the plaintiff will succeed in establishing the elements of that cause of action." *Id.* at 33. It then remanded the case to the trial court to examine "if the bar owners in this case have actually suffered greater losses than the losses suffered by other citizens and businesses." *Id.*

[28] *City Bar, Inc.,* 349 So. 3d 22, 25-26; *Chambers,* 595 So. 2d at 603 (La. 1992).

**c. Louisiana Takings Clause *Chambers* Prong 2: The Revival Provision is not a "Taking" in the *Constitutional Sense* and Therefore No Compensation is Owed.**

Because Defendant did not satisfy the first prong of the *Chambers* analysis, this Court need not address the remaining elements. *Chambers*, 595 So. 2d at 603. However, out of an abundance of caution, Plaintiff submits that the second prong is likewise not met.

Defendant claims that the second prong of the *Chambers* analysis requires the court to "determine whether the property has been taken or damaged." [R. Doc. 9-1 at 9]. Once again, Defendant conceals that the second prong requires the court to analyze whether the property "has been taken or damaged, *in a constitutional sense." Id.* (emphasis added). As this language implies, not every taking or damaging of private property amounts to a "taking" or "damaging" within the meaning of the Louisiana Takings Clause.

The language of the Louisiana Takings Clause itself specifically states that "the right to acquire, own, control, use, enjoy, protect, and dispose of private property… is subject to *reasonable statutory restrictions* and *the reasonable exercise of the police power*." LA. CONST. ANN. art. I, § 4(A). This language reflects longstanding Louisiana jurisprudence that "uncompensated obedience to a regulation enacted for the public safety under the police power of the state is not a taking of property without due compensation" *City of Shreveport*, 167 La. at 781. Thus, courts consider whether "Louisiana has a significant safety interest" that the law intends to address. *Faulk*, 172 So. 3d at 1052.

34

In 1929, the Louisiana Supreme Court upheld a law which mandated destruction of piers owned by a private company because those piers were obstructing the roadway. *City of Shreveport*, 167 La. at 781. This destruction went against an ordinance previously issued by the city which had given the claimant, a private company, the right to construct those very same piers despite their encroachment on the roadway. *Id*. In the original ordinance, the city had specified that the private company's right to encroach on the streets was being granted 'in perpetuity, without repeal or modification.'" *Id.* The company claimed that it was owed just compensation for the destruction of its piers which had been legally constructed in reliance on the ordinance granted by the government. The Louisiana Supreme Court rejected this argument. It held that the prior ordinance was "a mere futile attempt to barter away the police power of the municipality" and noted that "[n]o principle of constitutional law is better settled in this country than the principle that neither the Legislature nor the people themselves, much less their servants, can bargain away the public health, the public morals, or the public safety, since government is organized with a view to their preservation, and cannot divest itself of the power to provide for them." *Id.* at 779.  The Court went on to say that "[i]t is competent for a state, in the exercise of its police power, to authorize a city council to destroy property without compensation to the owner" and that "[t]he destruction by legislative authority of private property for a public purpose, without previous adequate compensation, is not a taking of such property without due process of law, but is a competent exercise of the police power of the state." *Id* at 782. Further, it confirmed that "[a] vested interest cannot be asserted against [the police power]" because that would "preclude development and fix a city forever in its primitive conditions" and "[t]here must be progress, and if in its march private interests are in the way, they must yield to the good of the community." *Id.* at 779.

The Louisiana Supreme Court has explained in detail the justification for allowing reasonable restrictions on the use of property to go uncompensated. "[G]overnmental regulation— by definition—involves the adjustment of private rights for public benefit. To require compensation whenever the law curtailed the potential for economic exploitation 'would effectively compel the government to regulate by *purchase.*'" *La. Seafood Mgmt. Council v. La. Wildlife & Fisheries Comm'n*, 97-1367 (La. 5/19/98); 715 So. 2d 387, 392 (citing Laurence H. Tribe, *American Constitutional Law* 596–97 (2d ed.1988)). "As a result, economic restraints generally do not rise to the level of a taking." *La. Seafood*, 715 So. 2d at 392 (citing *Pa. Coal,* 260 U.S. 393 at 413).

Defendant made no serious attempt to prove that the Revival Provision amounts to a taking in *the constitutional sense*, as it failed to even acknowledge the existence of this requirement. As described above, reasonable restrictions on the use of property do not amount to a taking in the constitutional sense. *Bienvenu II* ruled that the revival provision was a valid use the police power of the state,[29] and that in addition to being reasonable, the restrictions it imposes are "narrowly tailored" to the "legitimate and compelling" governmental interests it serves. *Bienvenu II*, 386 So. 3d at 291-92. Given these rulings, it cannot seriously be argued that the Revival Provision amounts to a taking or damaging *in the constitutional sense* for purposes of the Louisiana Takings Clause. Therefore, Defendant has failed to carry its heavy burden to prove a taking in the constitutional sense.

### d. Louisiana Takings Clause *Chambers* Prong 3: *Bienvenu II* Already Established that the Revival Provision was Enacted for a Public Purpose.

---

[29] *Bienvenu II,* 386 So. 3d at 290–91 (acknowledging that the Revival Provision "is social welfare legislation" and as a result must meet the police power test as described in *Bazley v. Tortorich*, 397 So.2d 475, 483 (La. 1981) which requires that the law must be "reasonable in relation to the goal to be attained and is adopted in the interest of the community as a whole.")

The court need not address the third *Chambers* prong because the first two were not satisfied, but again, in the interest of completeness, Plaintiff will address this prong as well. Under *Chambers*, the third prong asks, "whether the taking or damaging is for a public purpose". *Chambers*, 595 So. 2d at 603. Article I, Section 4 specifically recognizes that "[t]he... removal of a threat to public health or safety caused by the existing use or disuse of the property" constitutes a "public purpose" for the purposes of the Louisiana Takings Clause.

As explained above, *Bienvenu II* already determined that the Revival Provision "serves three public purposes" and "has been demonstrated to have a substantial relationship to public safety, morals and welfare." *Bienvenu II*, 386 So. 3d at 290-92. One of those purposes is to include the uncovering of hidden child predators in our midst in order to prevent future sexual abuse of the children of Louisiana. *Id*. Defendant's use of its right to assert prescription prevented Survivors from coming forward, which has the effect decreasing the likelihood that hidden predators will be caught and increasing the likelihood that more children will be sexually abused in the future. As such, Defendant has not met its heavy burden of proving clearly and convincingly that the Revival Provision is an unconstitutional taking.

## C.  FEDERAL BILL OF ATTAINDER

### a.  Defendant's Federal Bill of Attainder Argument has Already Been Rejected.

Defendant's Bill of Attainder challenge is also a facial constitutional challenge, which must be proven clearly and convincingly.  The Revival Provision is presumed not to violate the Bill of Attainder Clause "and all doubts as to [the Revival Provision's] validity are resolved in favor of its constitutionality." *Bd. of Barber Examiners of La. v. Parker*, 190 La. 214, 273 (1938).

This Bill of Attainder challenge to the Revival Provision is not new, as it has been argued to various Louisiana courts and has been consistently rejected. It was explicitly rejected by Judge

Zainey in the Eastern District Court of Louisiana.[30]  Judge Zainey dismissed this Bill of Attainder challenge, calling it "easily rejected as meritless." *Id.* at *5. Judge Zainey declared that "[a] bill of attainder is a law that legislatively determines guilt and inflicts punishment upon identifiable individuals without providing the protections of a judicial trial" and "[n]either La. R.S. § 9:2800.9 nor § of Act 322 legislatively determine guilt, identify any individuals, or deprive a defendant of a judicial trial." *Id.* at *17 (citations omitted).

The Bill of Attainder challenge is not viable in light of *Bienvenu II* which has already ruled on the underlying factual issues that Defendant would have needed to prove in order to succeed on a Bill of Attainder challenge. Most notably, to succeed on its Bill of Attainder challenge, Defendant must prove that the Revival Provision was motivated by a punitive intent. *Flemming v. Nestor*, 363 U.S. 603, 619 (1960). "[U]nmistakable evidence of punitive intent . . . is required before a Congressional enactment of this kind may be struck down" as a Bill of Attainder. *Id. Bienvenu II* determined that the Revival Provision was not motivated by a punitive intent but instead was motivated by a legislative intent to further "legitimate interest in protecting its citizens who were sexually abused as minors and in providing them with the ability to seek redress in the courts." *Bienvenu II*, 386 So. 3d at 292.

Defendant must also prove that the Revival Provision "singles out a person or class by name" or applies to "easily ascertainable members of a group." *Foretich v. U.S.*, 351 F.3d 1198, 1217 (D.C. Cir. 2003). The Revival Provision does not meet this requirement. Like all other legislation which provides a remedy related to a particular cause of action, the Revival

---

[30] See 2022 WL 2065539, at *5, *vacated and remanded sub nom. Lousteau v. Holy Cross Coll., Inc.*, 81 F.4th 437 (5th Cir. 2023).

Provision applies equally to all litigants who may become a party to a lawsuit involving that cause of action.[31]

Finally, even if a law burdens a particular class of persons, it will not be deemed a bill of attainder so long as it "serve purposes that are not only nonpunitive, but also rational and fair" and  if there is "a nexus between the legislative means and legitimate nonpunitive ends." *Id.* at 1222.   Here, *Bienvenu II* ruled that the nature of the relief provided was "narrowly tailored" and "demonstrated to have a substantial relationship to public safety, morals and welfare." *Bienvenu II*, 386 So. 3d at 290-92. "[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute" on Bill of Attainder grounds. *Flemming*, 363 U.S. at 617. Defendant has failed to show such proof.

## IV.    FEDERAL *EX POST FACTO* CLAUSE

Defendant's *Ex Post Facto* Clause discussion is a lengthy historical detour lacking in purpose and devoid of any actual argument. As Defendant acknowledges immediately, the United States Supreme Court has always held that the *Ex Post Facto* Clause applies only to criminal cases and not to civil cases. [R. Doc. 70-1 at 22]. In *Calder v. Bull*, the Court declared that the *Ex Post Facto* Clause applies to criminal laws – not civil laws. *Calder v. Bull*, 3 U.S. 386, 390 (1798). This rule has remained unchanged for over 200 years.

Defendant does not ask this court to overrule *Calder* nor does it argue that the Revival Provision is a criminal law. Instead, Defendant devotes five pages to cataloging an assortment of vignettes in which a constitutional delegate or person attending constitutional ratifying session made a statement which gave the impression that they were unaware of the true technical meaning

---

[31] This Defendant is not the only defendants who will face suit. Nor are the other various Catholic organizations. In fact, the State of Louisiana (which is the proper party to sue in cases where a child was sexually abused while in the care of Louisiana's Department of Child and Family Services) has already been sued under the Revival Provision. Various public school boards, cities, police departments, and other state actors have been sued under it as well.

of the *Ex Post Facto* Clause (i.e. that it applies to criminal laws only) [R. Doc. 9-1 at 22-29]. Those

five pages are essentially a regurgitation of a single law journal article published over 100 years

ago. *See* Oliver Field, *Ex Post Facto in the Constitution*, 20 MICH. L. REV. 315, 321 (1922)).[32] But

even the author of that article acknowledged that there is "singular agreement as to the correctness

of the [*Calder v. Bull*] holding" and "the case doctrine of *Calder v. Bull* is so well settled as to

have become one of the commonplaces of American constitutional law." *Id.*

Defendant's compilation of historical hearsay is not law. *Calder v. Bull* is law. Defendant

does not argue that *Calder v. Bull* was wrongly decided or ask this Court to overturn it. Instead, it

merely states in its conclusion that it is unconstitutional as an *ex post facto* law. [R. Doc. 9-1 at

30.] It goes without saying that breaking from *Calder* would have far reaching impacts for

American jurisprudence. In order to succeed on the *Ex Post Facto* challenge, Defendant is

required, and did not, establish by clear and convincing evidence that no circumstances exist under

which the act would be valid. *La. Assessors' Retirement & Relief Fund*, 986 So.2d at 1, 2-3.

## V.   THIS COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS. ALTERNATIVELY, TO THE EXTENT THERE IS ANY DOUBT AS TO THE ISSUES ARISING UNDER THE LOUISIANA CONSTITUTION, IT SHOULD CERTIFY THOSE QUESTIONS TO THE LOUISIANA SUPREME COURT

For the reasons articulated above, this Court, like many district courts around the state have

already done, should have little difficulty categorically denying Defendant's motion to dismiss.

While this Court has sufficient guidance from the Louisiana Supreme Court in *Bienvenu II* to

determine that Defendant's Motion is wholly without merit, to the extent that this Court is not

convinced of how to decide the arguments arising under the Louisiana Constitution, Plaintiff

---

[32] The writer of the article Defendant relied on, Mr. Oliver Field, states that the "purpose of this study is to determine, if possible, what was included in the term ext post facto when it was placed in the Constitution of the United States." Field, at 317. Mr. Field admits that "[o]n account of the meagerness of the information which we have concerning the debates in both the federal convention and the state ratifying conventions, it is almost impossible to give an unqualified answer to these questions." Field, at 317.

requests that this Court certify the question to the Louisiana Supreme Court. Louisiana Supreme Court. Rule XII was recently amended to allow a federal district court to certify a question to the Louisiana Supreme Court when there is no controlling precedent from the Supreme Court. *See generally*, Louisiana Supreme Court Rule XII. Rule XII provides, in pertinent part:

> When it appears to . . . any district court of the United States . . . that there are no clear controlling precedents in the decisions of the supreme court of this state, such federal court before rendering a decision may certify such questions or propositions of law of this state to the Supreme Court of Louisiana for rendition of a judgment or opinion concerning such questions or propositions of Louisiana law.

LA. SUP. CT. Rule XII.

Here, the Louisiana Supreme Court has definitively declared that the Revival Provision is constitutional and has analyzed the pertinent factors and elements to determine that the arguments presented by Defendant in the instant Motion are meritless. As explained above, Defendant's Motion is simply a regurgitation of old arguments framed in the context of different provisions of the United States and Louisiana Constitution. While this Court has enough guidance from the Louisiana Supreme Court to deny the Motion outright, to the extent this Court has any doubt as to resolution of the issues arising under the Louisiana Constitution, Plaintiff requests that this Court certify the question to the Louisiana Supreme Court to give the Court the opportunity to determine the validity of the Revival Provision under the Louisiana Constitution (again).

## VI.    CONCLUSION

"An Act of the Legislature is presumed to be legal until it is shown that it is manifestly unconstitutional and all doubts as to its validity are resolved in favor of its constitutionality." *Bd. of Barber Examiners of Louisiana v. Parker*, 190 La. 214, 273, 182 So. 485, 504 (1938). "[I]it must be shown clearly and convincingly that it was the constitutional aim to deny the Legislature

the power to enact the statute." *Bd. Of Dirs. Of the La. Recovery Dist. v. All Taxpayers, Property Owners, & Citizens of La.*, 529 So.2d 384, 388 (La. 1988).

The Louisiana Supreme Court in *Bienvenu II* definitively declared that the Revival Provision at issue is constitutional. Defendant's repackaging of old, failed arguments has no merit and should be denied by this Court. Defendant has failed to carry its burden, and Plaintiff requests that this Honorable Court deny Defendant's motion to dismiss. Alternatively, Plaintiff requests that this Court certify the question to the Louisiana Supreme Court.

Respectfully submitted,

**GAINSBURGH, BENJAMIN,
DAVID, MEUNIER & WARSHAUER, L.L.C.**


BY:    /s/ *Brittany R. Wolf-Freedman*
BRITTANY R. WOLF-FREEDMAN (La. Bar #36733)
GERALD E. MEUNIER (La. Bar #9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
Email:      bwolf@gainsben.com
Email:      gmeunier@gainsben.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/*Brittany R. Wolf-Freedman*
**BRITTANY R. WOLF-FREEDMAN**